UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


GLEN McDANIEL,                      )
                                   )
         *Plaintiff,*                  )
*v.*                                  )                 No.1:06-cv-193
                                   )                 *Edgar*
KINDRED HEALTHCARE,                )
d/b/a KINDRED HOSPITAL             )
                                   )
         *Defendant.*                  )


**MEMORANDUM**

Plaintiff Glen McDaniel brings this employment discrimination action against his former

employer Kindred Healthcare d/b/a Kindred Hospital ("Kindred").  Plaintiff alleges that he was

discriminated against on the basis of race and age in violation of Title VII, 42 U.S.C. § 2000e *et*

*seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").  He

further alleges that Kindred unlawfully retaliated against him for filing a discrimination charge.

Kindred moves for summary judgment dismissal of all of Plaintiff's claims.  [Court Doc.

No. 26].  Plaintiff opposes the motion for summary judgment.  [Court Doc. Nos. 34, 35].

Plaintiff also moves for an extension of time to respond to Kindred's motion for summary

judgment.  [Court Doc. No. 33].  Plaintiff's motion for an extension of time will be **GRANTED**.

After reviewing the record in the light most favorable to the Plaintiff, the Court concludes that

Kindred's motion for summary judgment will also be **GRANTED**.

I.      **Background Facts**

 At the time Plaintiff first filed his complaint, he was a fifty-four year old African-

American male who had been employed at Kindred Hospital in Chattanooga, Tennessee until his

resignation on January 14, 2005. [Court Doc. No. 1, Complaint]. Prior to his resignation, Plaintiff was employed as the Chief Operating Officer ("COO") at Kindred's Chattanooga facility. His Complaint alleges several different types of discrimination, including harassment on the basis of race, failure to promote, discrimination in compensation, as well as discriminatory conditions in general. *See* Complaint.

Plaintiff first began working for Kindred in 1993, and by 1997, he had become the COO for the Chattanooga facility, a hospital that Kindred designated a Level I, or one of its group of smallest hospitals with around fifty beds. Complaint; [Court Doc. No. 26-2 Affidavit of Ruth A. Lusk ("Lusk Affidavit"), ¶ 6].

### A.     Alleged Racial Harassment

In 1999 Plaintiff received an email containing "threatening racist content." [Court Doc. No. 26-3, Deposition of Glen McDaniel ("McDaniel Dep.") p. 104]. Plaintiff was unsure who sent the racist email. *Id.* However, Plaintiff recalls that two Kindred employees were fired during the same two-week period in which he received the offensive email. *Id.* at 105. Plaintiff agrees that one of the employee's termination notice states that she was terminated for, among other reasons, race discrimination. *Id.* at 106. Plaintiff further admits that the other employee whom he suspected of creating the email was also terminated from Kindred. *Id.* at 106-108. Plaintiff eventually reported the incident to his supervisor, who had already seen the email. *Id.* at 107-09. Plaintiff states that his supervisor told him he "was personally sorry" and that "[t]hey would look into it." *Id.* at 109.

In 2001 Plaintiff received a racist photograph in his mailbox at work. His supervisor suggested that he call the police, and he did so. In addition, Plaintiff admits that the regional

director of compliance was very supportive of him during that difficult time. *Id.* at 110-111. Plaintiff felt that although his supervisor recommended that he report the incident to the police, he also appeared to perceive the photo as a prank or a joke. *Id.* Plaintiff admits that other than the two racist notes left in his mailbox in 1999 and 2001, he was not subjected to any other racially offensive comments or behavior by anyone associated with Kindred. *Id.* at 112; 130.

**B.      Failure to Promote**

Plaintiff received a Bachelor of Science in medical technology. In 1984 he received a Master's Degree in clinical chemistry. McDaniel Dep., pp. 13-14. In 2004 Plaintiff received a Master's Degree in Business Administration from American Continental University in Atlanta. *Id.* He holds a license as a medical technologist and as a clinical lab scientist. *Id.* at 14-15. Prior to his tenure with Kindred, Plaintiff was the laboratory manager at Southwest Hospital in Atlanta and the laboratory supervisor of St. Thomas Hospital Laboratory in the Virgin Islands. *Id.* at 15.

Plaintiff began working part-time as a medical technologist in a laboratory for a company in Atlanta that Kindred later acquired. *Id.* Within a few months he advanced to the Education and Information Systems Manager. *Id.* at 15-16. In 1997 Plaintiff applied for a position in Chattanooga known as the Assistant Administrator for Clinical Operations that later became the Chief Operations Officer ("COO") position. *Id.* at 18. The Chief Executive Officer ("CEO") at the Chattanooga facility, Steve McGraw, hired Plaintiff for the position. In 1999 the facility changed its name to Kindred. *Id.* at 16.

Mr. McGraw remained Plaintiff's supervisor "for a couple of years," and then the company terminated him for cause. McDaniel Dep., p. 19. Plaintiff asserts that following Mr.

McGraw's termination, he "expressed an interest" in the CEO position, but that he did "not apply formally." *Id.* at 20. He alleges that the regional vice president told Plaintiff on the day that Mr. McGraw was terminated that they had chosen a successor who was currently the CEO at a larger Kindred hospital, but who wanted to return to the Chattanooga area. *Id.* The other candidate had been with the company for a long time, and Kindred wanted to allow him to fill the position. So the regional vice president informed Plaintiff that they would not be considering him for the CEO position. *Id.* Lewis Ransdell replaced Mr. McGraw as CEO of the Chattanooga hospital in 2001. Lusk Aff., ¶ 8. Plaintiff admits that Mr. Ransdell had been a CEO at a larger hospital facility prior to his transfer to Chattanooga. McDaniel Dep., p. 62-63.

Sometime in 2003 Mr. Ransdell decided that he would like to terminate Plaintiff's employment with Kindred. Lusk Aff., ¶ 9. *See also,* [Court Doc. No. 35, Ex. 8]. Ms. Lusk initially approved the request, but asked to see more information regarding Plaintiff. *Id.* at ¶¶ 10-11. Ms. Lusk reviewed Plaintiff's favorable employee evaluations, and Kindred ultimately decided that it would not terminate him. *Id.* at ¶¶ 11-12. At the time Ms. Lusk and Mr. Ransdell were discussing Plaintiff's possible termination, Plaintiff was unaware of the discussions and their exchange of emails relating to the topic. *Id.* at ¶ 13.

Kindred terminated Mr. Ransdell in April of 2004 for reasons unrelated to Plaintiff. Lusk Aff., ¶ 15. Plaintiff applied for the vacant CEO position at that time. McDaniel Dep., p. 22. Plaintiff discussed the opening with company officials in charge of the hiring, although he did not have a formal interview for the position. *Id.* at 22-23.

Although Kindred considered Plaintiff for the newly open CEO position, it decided to hire a man named Joe Bryant instead. Lusk Aff., ¶ 16. Plaintiff admits that he does not know

the details of Mr. Bryant's experience and education prior to his attainment of the CEO position at the Chattanooga hospital. McDaniel Dep., p. 64. Plaintiff speculates that Mr. Bryant, a Caucasian, younger man, was less qualified because he did not "have the history with the company," had less tenure in an executive position, and had not worked at a long-term acute care ("LTAC") hospital. Mr. Bryant's resume indicates that he has a Bachelor's Degree in Business Administration and a Master's Degree in Health Administration. He had worked for three years as a CEO of the Southwest Regional Medical Complex in Lubbock, Texas. His resume indicates that the hospital consisted of 30 beds of LTAC and 58 beds of skilled sub-acute care. The resume further lists a series of significant accomplishments in the CEO position, such as expanding medical staff, receiving numerous corporate awards, and developing an in-house staff daycare center. [Court Doc. No. 26-2, Resume of William "Joe" Bryant]. The resume also indicates prior experience as a hospital executive administrator, administrator, and assistant administrator. Ms. Ruth Lusk, then Kindred's Regional Senior Vice President for the East Region, Hospital Division, was involved in the decision-making process that led to Mr. Bryant's hiring. Lusk Aff., ¶¶ 2, 18. Ms. Lusk believed that "Mr. Bryant was extremely well qualified for the position and had substantially more experience than Mr. McDaniel." *Id.* at ¶ 18.

## C.     Alleged Discrimination in Compensation

Plaintiff also alleges that in addition to failing to receive a promotion to CEO on two different occasions, one in 2001 and one in 2004, he "was continually paid less than his peers." Complaint. When Plaintiff first received the COO position in Chattanooga he "was satisfied with the entire package. It was a promotion. It was a chance to use more of [his] skills and so on." McDaniel Dep., p. 31. Plaintiff received annual raises every year. *Id.* at 33. The raises

varied from year to year, and Plaintiff guessed that his raises averaged about 3 percent per year. He further recalled receiving a 6 percent raise in one particular year. *Id.*

Plaintiff asserts that he received a letter from the President of the Hospital Division in approximately early 2003 that explained the salary ranges for different positions. McDaniel Dep., p. 35. Plaintiff asserts that he was "a little below mid-range" for his level at a hospital the size of the Chattanooga hospital after four years of experience. *Id.* Plaintiff discussed his perception of his salary with his supervisor at that time, Mr. Ransdell. *Id.* Mr. Ransdell discussed Plaintiff's salary with Ms. Lusk. *Id.* at p. 36. Ms. Lusk avers that Plaintiff received a "substantial raise at the end of 2003" and "consistently received annual raises." Lusk Aff., ¶ 20. She asserts that Mr. Ransdell advocated for Plaintiff to receive the 2003 raise, although Plaintiff asserts that the raise based on 2003 discussions "never materialized." Lusk Aff., ¶ 21; McDaniel Dep., p. 36. Plaintiff admits that he received a market adjustment at some point in time because he was "substantially below the range for COOs." McDaniel Dep., p. 36. Plaintiff asserts in his deposition that he complained to his superiors about his salary range for several years, but only received one 6 percent market adjustment and much smaller annual raises. *Id.* at pp. 34-44. Unfortunately for the court, the record does not include a summary of Plaintiff's salaries and raises or any of Plaintiff's employee pay records.

Plaintiff asserts that an employee named Keith Jones, who was the Chief Financial Officer ("CFO") of the Chattanooga hospital and who had only worked for Kindred for a couple of months longer than Plaintiff, received higher compensation than Plaintiff did. McDaniel Dep., pp. 39-43. Ms. Lusk asserts in her affidavit:

> Keith Jones was not similarly situated to Mr. McDaniel, as Mr. Jones also had CFO duties for Memphis and Charleston as well as Chattanooga. Mr. Jones'

compensation reflected his significantly extended responsibilities and his superior performance in that regard. Although Mr. McDaniel and Mr. Jones were both located in Chattanooga, it is not comparable between Mr. McDaniel's salary to that of Mr. Jones, as Mr. McDaniel did not have COO duties for any Kindred facilities other than Chattanooga.

Lusk Aff., ¶¶ 22-24. Plaintiff asserts that the difference in pay existed before Mr. Jones took on responsibilities at other hospitals. McDaniel Dep., p. 61.

Although Plaintiff did not have any reason to believe that Kindred was discriminating against him on the basis of his race and age at the time of the discussions surrounding his salary, he subsequently determined that the disparities had to do with his race and age. He states in his deposition:

I knew I was not being treated equitably and that's why I raised it on several occasions, but I did not conceptionalize [sic] in my mind what the reason was until subsequently. I did not think about it at the time. . . . Well, subsequently, I realized it had to do in terms of demographics of the company and so it had to do with race and age and those kind of demographics.

McDaniel Dep., p. 44.

Ms. Lusk's affidavit states that:

Each CEO and COO's salary was based on a number of factors, such as performance evaluations, experience, geographical area, market/competitive factors, and job duties. Mr. McDaniel consistently received annual raises, including a substantial raise at the end of 2003. Mr. McDaniel's own CEO, Lewis Ransdell, advocated for him to receive this raise. . . . Despite his location in a small market, Mr. McDaniel's compensation was by no means the lowest COO salary in the Kindred system.

Lusk Aff., ¶¶ 19-25. Plaintiff alleges that other COOs made more than he did. However, it is unclear from Plaintiff's deposition and from the Complaint whether the other COOs were working at comparable facilities. McDaniel Dep., p. 59, Complaint. Thus, aside from specific allegations of being paid less than Mr. Jones, Plaintiff does not identify a comparator in the COO

position at a Level I hospital outside the protected classes who was making more than he was.

**D.    Plaintiff's Resignation and Alleged Retaliation**

In August of 2004, Kindred underwent a reorganization and restructuring.  Ms. Lusk

describes the change in the following way:

> In 2004, Kindred adopted a new organizational structure and, as a result, the COO
> position at all Under 50 Hospitals in the East Region, including Chattanooga, was
> eliminated.  These changes were announced in August of 2004.  The
> reorganization was to streamline the leadership group for the Under 50 Hospitals
> in the East Region.

Lusk Aff., ¶ 26.  Plaintiff learned of the reorganization while listening to a conference call with

Mr. Bryant in the summer of 2004.  McDaniel Dep., p. 64.  Following the conference call

between Ms. Lusk and Mr. Bryant, Plaintiff attempted to ascertain more information regarding

the elimination of the COO position.  *Id.* at 64.  Plaintiff is unaware of whether Kindred had any

open CEO positions to which he could have been promoted in late 2004.  *Id.* at 66.

At some point in the fall of 2004, Ms. Lusk began discussing the elimination of the COO

position with Plaintiff and proposed that Plaintiff enter into a CEO-in-training position following

the restructuring.  *Id.* at 64-67.  Ms. Lusk suggested that Plaintiff work in various hospitals in

Pittsburgh and Greensboro learning about different departments and maintaining his job while

waiting to see if a CEO position became available.  *Id.* at 69-70.

Sometime in December of 2004, as Plaintiff was making arrangements to transfer to the

CEO-in-training position, he received a folder containing emails exchanged between Ms. Lusk

and Mr. Ransdell discussing his possible termination in early 2003.  McDaniel Dep., p. 72.

Plaintiff is unsure of who provided him with the emails because the individual just left them on

his desk in his office.  *Id.* at 72-73.  Plaintiff admits, however, that the emails between Ms. Lusk

and Mr. Ransdell did not mention race or age in any way.  *Id.* at 95, 96.  Plaintiff further admits

that Mr. Ransdell had been terminated from the company by the time the decision to eliminate

the COO position was made and that Mr. Ransdell did not have anything to do with that

decision.  *Id.* at pp. 95-96.

Plaintiff's lawyer wrote Kindred a letter in late 2004 asking for more time for him to

transition to his new position for personal and professional reasons.  McDaniel Dep., pp. 71-74.

On January 5, 2005 Plaintiff participated in a conference call with Ms. Lusk and others to

discuss his transition to the CEO-in-training position.  *Id.* at 74.  During the conversation,

Plaintiff felt that Ms. Lusk was "very crass and rude."  *Id.* at 74, 98.  He asked if he could have

until the end of February to transition to the new position, and the parties agreed that they would

consider his request and reconvene on another conference call on January 13th.  *Id.* at 74-75.

Plaintiff believes the training position was beneath his skill levels and required him to be

trained alongside other younger individuals whom he believed he had mentored.  *Id.* at 75-76.  In

his deposition Plaintiff describes his confusion over the CEO-in-training position in the

following way:

> . . . the offer just did not make sense in terms of –for instance, the training, after
> someone who had been running like huge laboratories, being in a hospital
> environment for maybe 25 years, having a CEO-in-training program where I had
> to work in dietary and so on, that just did not make a lot of sense.  The fact also
> that in my tenure with the company, I had not known anyone who had had to go
> through such a program in order to be promoted to CEO. . .  The content of the
> CEO-in-training program seemed kind of thrown together after many months of
> asking what it entailed.  Towards the end of the year, it was kind of thrown
> together and sent to me.

McDaniel Dep., p. 79; *see also* pp. 114-116.

In contrast, Ms. Lusk describes the CEO-in-training position in her affidavit in the

following way:

> Prior to the restructuring, Mr. McDaniel met with me in May of 2004 and expressed interest in promotion to a CEO position when one became available.
>
> At the time of restructuring, I began to explore ways to find another position with the company for Mr. McDaniel.
>
> Accordingly, Ms. Gaylia Bond, Human Resources Vice President, and myself proposed that Mr. McDaniel temporarily serve as an Operations Specialist at three different hospitals–Kindred Hospital–Pittsburgh, Kindred Hospital–Greensboro, and Kindred Hospital–Cleveland, which would expose Mr. McDaniel to larger operations than his experience at a Level I hospital had provided to him. . . .
>
> I communicated to Mr. McDaniel that in order to help him secure a CEO position at a larger hospital, he would participate in a training program to gain additional experience in larger hospitals while waiting for a CEO position to potentially come available because at the time there were no CEO positions available. I explained that by participating, Mr. McDaniel's employment would continue even though his COO position was being eliminated. . . .
>
> Kindred's decision to eliminate Mr. McDaniel's position was based solely on its need to restructure its hospitals with less than 50 beds, eliminating all of the COO positions in these hospitals. . . .
>
> Mr. McDaniel was not simply terminated, unlike the other Under 50 Hospital COOs. Rather, he was given the opportunity to enter a CEO training program which would have allowed him to hone his skills as an administrator while waiting for a CEO position to become available.
>
> None of the COOs whose positions were eliminated were promoted to a CEO position.

Lusk Aff., ¶¶ 27-44. Ms. Lusk further asserts that following Plaintiff's abrupt resignation, "three CEO positions became available within Kindred between January and June of 2005. Mr. McDaniel would have been considered and very likely promoted to CEO had he not resigned." *Id.* at ¶ 36. Plaintiff agrees that several CEO positions opened in 2005, but he asserts that he does not know if he would have been chosen for them. McDaniel Dep., p. 117.

Prior to the second conference call regarding the CEO-in-training position, Plaintiff abruptly resigned from his employment. McDaniel Dep., pp. 82-83. He did not inform anyone at Kindred that he believed the company was discriminating against him on the basis of race

-10-

and/or age prior to his resignation. *Id.* at 83. Although he offered to keep working for thirty days, Mr. Bryant, his supervisor, determined that he should cease working on the day of his resignation. *Id.* at 83, 124. He did not ask for any severance upon leaving, but he thinks Kindred may have paid him through the end of the month of January or through the 30-day notice period. *Id.* at 124.

Plaintiff contends that Kindred retaliated against him by not providing him with severance even though he resigned abruptly without notice and was not terminated. He explains in his deposition:

> Well, my understanding is that severance is something which is offered and I had known from being with Kindred that they would terminate people for pretty serious stuff and they would offer them severance and in my mind, I thought that – I thought it was retaliation in the sense that here I was leaving with a good performance record and I was not offered severance.

McDaniel Dep., pp. 122-123. However, the record does not reveal whether, as a matter of course or policy, Kindred provided severance to anyone who ever voluntarily left the company. Plaintiff also does not identify any similarly situated individuals who abruptly resigned and received a severance package.

Plaintiff admits that he does not know whether other COOs whose positions were eliminated were provided with severance packages. *Id.* at 66. He further acknowledges that he does not know if any COOs of Kindred's Level I hospitals remained following the restructuring in 2004. *Id.* at 77-78.

Although Plaintiff filed a charge of discrimination with the Tennessee Human Rights Commission in December of 2004, no one at Kindred mentioned the discrimination charge to him. The discrimination charge alleges discrimination on the basis of race and age, but does not

mention retaliation.  [Court Doc. No. 26-3, pp. 36, 43].

## II.    Standard of Review

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,475 U.S. 574, 587 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.  The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435.  The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof.  *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter.

*Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36.  If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment.  *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

**III.    Analysis**

**A.    Statute of Limitations**

The ADEA provides that in states that have enacted their own laws prohibiting age discrimination in employment, a charge of discrimination must be filed with the EEOC "within 300 days after the alleged unlawful practice occurred, or within 30 days after receipt by the individual of notice of termination of proceedings under State law, whichever is earlier."  29 U.S.C. § 626(d).  In addition, Title VII requires a plaintiff to file a charge of discrimination within 300 days of the alleged discriminatory practice if the charge is filed in a state that has its own employment discrimination laws, otherwise known as a deferral state.  42 U.S.C. § 2000e-5(e).  Tennessee is a deferral state and has its own anti-discrimination statute.  *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 94 n.8 (Tenn. Ct. App. 1996); *see* Tenn. Code Ann. § 4-2-101 (1991).

The U.S. Supreme Court has recently provided guidance to lower courts regarding the timeliness of discrete discriminatory actions and hostile environment discrimination:

> We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period–180 or 300 days–set forth in 42 U.S.C. § 2000e-5(e)(1).  A charge alleging a hostile environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.

-13-

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122, 122 S.Ct. 2061, 2077 (2002). In addition to decisions like a discrete failure to promote, the Supreme Court has also recently determined that a "pay-setting decision is a discrete act that occurs at a particular point in time." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 127 S.Ct. 2162, 2165 (May 29, 2007).

Based on this legal precedent, Plaintiff's failure to promote claim based on the 2001 failure to promote him to CEO of the Chattanooga hospital is time-barred. In addition, Plaintiff's claims of pay discrimination prior to 300 days before the filing of his discrimination charge are also outside of the statute of limitations.

Further, the allegations of harassment based on isolated emails sent to Plaintiff in 1999 and 2001 are time-barred as discrete incidents that fall outside the limitations period. Although claims of hostile environment harassment may constitute a pattern or practice that can extend beyond the limitations period as long as one incident is timely, Plaintiff's allegations of harassment do not fit into that scenario. Plaintiff alleges two isolated incidents of harassment, separated by two years. The incidents occurred in 1999 and 2001. Neither of them involved action by a manager, but involved racist emails sent by anonymous individuals. Plaintiff does not disagree that two employees lost their jobs around the time of the first incident or that his supervisor urged him to call the police regarding the second incident. No further incidents occurred following the 2001 email. Thus, these claims are untimely and will be **DISMISSED**.

B.     **Failure to Promote Claim and Disparate Pay Claim**

The ADEA provides that "[i]t shall be unlawful for an employer– (1) . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §

623.  Title VII likewise prohibits discrimination in employment on the basis of race.  42 U.S.C. §
2000e-2.

Liability under Title VII and the ADEA will depend on whether the protected trait of race
or age " 'actually motivated the employer's decision.' " *Reeves v. Sanderson Plumbing Products,
Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing *Hazen Paper Co. v.
Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

The Supreme Court has " 'established an allocation of the burden of production and an
order for the presentation of proof in . . . discriminatory-treatment cases.' " *Reeves*, 530 U.S. at
142 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d
407 (1993)); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d
668 (1973); *see also, Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir.
1998) (age discrimination).  The plaintiff must initially demonstrate a prima facie case of
discrimination.  *Reeves*, 530 U.S. at 142.  The plaintiff may establish a prima facie case "by
presenting direct evidence of intentional discrimination by the defendant, or by showing the
existence of circumstantial evidence which creates an inference of discrimination."  *Talley v.
Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted).

When a plaintiff chooses to establish a prima facie case of racial discrimination using
circumstantial evidence, the plaintiff must demonstrate: (1) membership in the protected group;
(2) qualification for the position; (3) an adverse employment decision; and (4) replacement by a
person outside the protected class or different treatment from similarly situated non-protected
employees.  *Newman v. Federal Express Corp.*, 266 F.3d 401, 405 (6th Cir. 2001) (citing *Talley
v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1246 (6th Cir. 1995)); *see also, McGinnis v. United*

*States Air Force*, 266 F.Supp.2d 748, 760 (S.D. Ohio 2003); *Ercegovich*, 154 F.3d at 350.

Once the plaintiff articulates a prima facie case of discrimination, the burden shifts to the defendant to demonstrate that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Reeves*, 530 U.S. at 142. Once the defendant makes such a showing, the *McDonnell Douglas* framework disappears and discrimination remains the sole issue. *Id.* at 143. At that point the plaintiff "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

The Sixth Circuit has determined that:

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.

*Peters v. Lincoln Electric Co.*, 285 F.3d 456, 471 (6th Cir. 2002) (quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). The burden of persuasion always remains with the plaintiff. *McGinnis*, 266 F.Supp.2d at 760 (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

An adverse employment action generally must be " 'a materially adverse change in the terms of . . . employment,' such as 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular

situation.'" *McGinnis*, 266 F.Supp.2d at 762 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885-86 (6th Cir. 1996)).

In a failure to promote case, the plaintiff must demonstrate: (1) membership in the protected class; (2) he applied for and was qualified for an open position; (3) he was considered for the position and was rejected; and (4) that other employees outside of the protected class with similar qualifications were promoted at the time that the plaintiff's request for promotion was refused. *See McGinnis*, 266 F.Supp.2d at 768; *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000). For purposes of the fourth prong of the prima facie case, the plaintiff must show that other individuals were similarly situated in "all relevant respects." *Donahoo v. Ohio Dep't of Youth Services*, 237 F.Supp.2d 844, 867 (N.D. Ohio 2002) (quoting *Evans v. Toys R Us Ohio, Inc.*, No. 99-3233, 221 F.3d 1334, 2000 WL 761803 *9 (6th Cir. June 2, 2000)).

Although the Sixth Circuit has cautioned district courts not to conflate the plaintiff's prima facie case with analysis of the employer's articulated legitimate non-discriminatory reason for the action, it is permissible in a failure to promote case to compare the qualifications of the plaintiff with the individual selected for promotion in reviewing the fourth prong of the prima facie case. *See White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232, 242-43 (6th Cir. 2005) (citing *Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 584-85 (6th Cir. 2002); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000)).

The Sixth Circuit has traditionally granted employers broad discretion in choosing among management level applicants. The Court has noted:

> Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates. So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates. An employer has even greater flexibility in choosing a management-level employee, .

-17-

. . because of the nature of such a position.

*Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (citations omitted); *see also, Browning v. Department of the Army*, 436 F.3d 692, 696-97 (6th Cir. 2006).

Plaintiff complains that in 2004 he applied for the CEO position vacated by Lewis Ransdell and that Kindred hired Joe Bryant instead. He argues that this failure to promote him constituted race and/or age discrimination. Upon review of the elements of the prima facie case of a failure to promote, the court concludes that Plaintiff has established the first three prima facie elements. He is in two protected classes, he was qualified for the position of CEO, and he applied for the position and was rejected. However, the court concludes that Plaintiff has failed to establish the fourth prong of his prima facie case. Plaintiff has not demonstrated that he had similar qualifications for the CEO position to those of Joe Brady. Mr. Brady's experience included work as a CEO of a 30-bed LTAC and 58-bed skilled sub acute unit hospital. His record of accomplishments in that position is lengthy. *See* [Court Doc. No. 26-2]. In addition to his experience as a CEO, Mr. Brady had experience as an administrator in several hospitals larger than Kindred's Chattanooga facility. Ms. Lusk, one of the decisionmakers, concluded that Mr. Brady "had substantially more experience" than Plaintiff. Lusk Aff., ¶ 18.

Plaintiff's deposition reveals that he had never before been a CEO of any hospital prior to his application to the CEO position in 2004. Prior to becoming the COO at Kindred, Plaintiff had held a variety of positions, including laboratory manager and Education and Information Systems Manager. None of his former positions, however, demonstrate the depth or breadth comparable to a CEO position. The court concludes that it need not examine the burden-shifting scheme under *McDonnell Douglas* because Plaintiff has failed to demonstrate the fourth prima

facie element of his failure to promote claim.

Plaintiff also alleges that he was discriminated against on the basis of his pay as a COO. Only the pay raise instituted 300 days prior to the filing of his discrimination charge on December 27, 2004 is within the statute of limitations. As noted *supra*, the record pertaining to precise salaries and raises is scant. It is not clear from the record that Plaintiff received a pay raise during the limitations period. However, even assuming Plaintiff states a timely claim regarding one discriminatory pay raise, his claim still must fail.

There is some evidence in the record that Plaintiff's pay was about mid-range or slightly below mid-range for other COOs at Kindred. However, Plaintiff fails to establish the fourth prong of his prima facie case pertaining to his claim of pay discrimination. Plaintiff only identifies one comparator with respect to his pay discrimination claim, Keith Jones, the CFO of the Chattanooga facility. First, it is unclear that the job of CFO at Kindred is comparable to the job of COO. In addition, Plaintiff admits in his interrogatory responses that Mr. Jones was also paid "below mid-range" for administrative positions at Kindred. [Court Doc. No. 35, Ex. 3, Interrogatory Response No. 3]. Mr. Jones received a higher raise than Plaintiff, but according to Plaintiff, his raise only elevated him to the mid-point level. *See id.* Further, Plaintiff does not dispute that Mr. Jones had additional responsibilities beyond serving as CFO for the Chattanooga facility. Ms. Lusk indicates that Mr. Jones was responsible for CFO duties in Memphis and Charleston, in addition to his CFO duties in Chattanooga. Lusk Aff., ¶ 22. Plaintiff had COO responsibilities only in Chattanooga. It thus appears that Mr. Jones was not similarly situated to Plaintiff, and Plaintiff has failed to demonstrate a prima facie case of pay discrimination. Plaintiff does not offer evidence regarding the pay of any other COOs at Level I hospitals.

Even if Plaintiff could demonstrate a prima facie case of disparate treatment in pay, Kindred asserts a legitimate non-discriminatory reason for his pay. Ms. Lusk indicates that COO salaries were "based on a number of factors, such as performance evaluations, experience, geographical area, market/competitive factors, and job duties." Lusk Aff., ¶ 19. Plaintiff admits that his salary was within the designated range for COO salaries. In addition, Plaintiff's own interrogatory responses indicate that Mr. Jones only made the midpoint in the acceptable salary range, and it is undisputed that Mr. Jones had additional duties in Memphis and Charleston. [Court Doc. No. 35, Ex. 3, Interrogatory Response No. 3]. Therefore, it appears logical that Plaintiff would make less than Mr. Jones did because he had fewer responsibilities in fewer cities.

When the burden shifts back to Plaintiff to demonstrate that Kindred's reasons for paying him below mid-range for COOs were discriminatory, Plaintiff fails to create any issue of fact that his salary level reflected age or race discrimination. There is nothing in the entire record that reflects or suggests age or race played a factor in any decision by Kindred's managers with respect to Plaintiff's career. There is also no evidence impugning Kindred's credibility. Plaintiff points to no other evidence that suggests that Kindred's reasons for paying him as it did were discriminatory. Plaintiff must demonstrate an issue of fact that his age or his race played some role in the alleged discrimination he suffered. *See Reeves*, 530 U.S. at 141. He has failed to do so.

Plaintiff points to evidence such as Mr. Ransdell's previous attempt to terminate him as evidence of discrimination. However, the important point that eludes Plaintiff is that Kindred *did not terminate him.* The fact that Mr. Ransdell considered terminating him does not establish

an adverse action.  In addition, although Ms. Lusk and Mr. Ransdell discussed terminating Plaintiff in an exchange of emails, it is important to note that nothing in the emails suggests that age or race played a role in Mr. Ransdell's desire to discharge Plaintiff.  *See* [Court Doc. No. 35, Ex. 8].  In fact, a close examination of the emails indicates that Mr. Ransdell wanted to "part ways" with Plaintiff due to some unstated conflicts between Plaintiff and Keith Jones, the CFO.  *See id.*  The emails between Ms. Lusk and Mr. Ransdell do not provide any support for Plaintiff's allegations of age or race discrimination.

Plaintiff further claims that his resignation was involuntary and the result of illegal discrimination.  In *Barnes v. GenCorp., Inc.* the Sixth Circuit held that in a reduction-in-force situation a plaintiff "does not make out a prima facie case absent additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."  896 F.2d 1457, 1465 (6th Cir. 1990).  In addition, "[a]lthough an employer is under no obligation to transfer to another position in the company an employee whose position has been eliminated, the employer violates the ADEA when it transfers other displaced employees but does not place the plaintiff in a new position because of age discrimination."  *Ercegovich*, 154 F.3d at 351 (citing *Hawley v. Dresser Indus., Inc.*, 958 F.2d 720, 723 (6th Cir. 1992)).

Kindred asserts that it engaged in a restructuring that eliminated all of the COO positions of Level I hospitals throughout the company.  Lusk Aff., ¶¶ 26-40.  Plaintiff does not dispute that all of these COO positions were eliminated.  Plaintiff contends that some COOs were promoted to CEOs without undergoing the CEO-in-training program that Kindred suggested for him.  However, Plaintiff provides no evidence that the other alleged COOs who were promoted were

similarly situated and were COOs at Level I hospitals. Plaintiff provides no support in the record refuting Ms. Lusk's assertion that *all* of the COO positions at Level I hospitals were eliminated. Lusk Aff., ¶ 40. Therefore, Kindred's reduction-in-force constitutes a legitimate non-discriminatory reason for the shift in Plaintiff's position.

Plaintiff suggests that his abrupt resignation was due to intolerable working conditions and was a form of constructive discharge. The court rejects this theory. The record demonstrates that Kindred eliminated all of the COO positions for the Level I hospitals, but instead of discharging Plaintiff, offered him an intermediate position until a CEO position became available. The court, therefore, concludes that Plaintiff's resignation was not the result of a constructive discharge, but rather was Plaintiff's rejection of an offer of an alternative position following the elimination of the COO position. In fact, the record demonstrates that Kindred took measures to salvage Plaintiff's career with the company by offering him a temporary CEO-in-training position with the opportunity to advance to a CEO position at a larger hospital when a position became available.

Plaintiff complains that Ms. Lusk informed him that there were "no guarantees" that he would be promoted to a CEO position. McDaniel Dep., p. 69; *see also*, p. 117. However, Ms. Lusk's caution merely appears to reflect sound business judgment. Ms. Lusk could not possibly be expected to foresee the future and know what CEO positions would become available or whether Plaintiff would continue his solid employee performance to warrant the promotion to a CEO position. Her caution in describing the CEO-in-training position merely appears to reflect the realities of the situation rather than to be indicative of age or race discrimination. For these reasons, Plaintiff's claims of race and age discrimination based on disparate treatment and

discrimination in pay must fail.

## C. Retaliation

Title VII prohibits discrimination against employees who attempt to protest or correct allegedly discriminatory employment conditions. *See* 42 U.S.C. § 2000e-3(a). To state a prima facie claim of retaliation, a plaintiff must demonstrate that: "1) [he] engaged in protected activity; 2) [his] employer knew of the protected activity; 3) the employer took an 'adverse employment action' against the plaintiff; and 4) a causal connection exists 'between the protected activity and the adverse employment action.'" *McGinnis*, 266 F.Supp.2d at 773 (quoting *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999)); *Nguyen*, 229 F.3d at 563.

The Sixth Circuit has held that:

> A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence.

*Nguyen*, 229 F.3d at 566 (quoting *Parnell v. West*, 1997 WL 271751, *2 (6th Cir. 1997)).

As the Sixth Circuit has noted:

> Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge. Retaliation claims are generally excepted from this filing requirement because they usually arise after the filing of the EEOC charge. However, this exception to the filing requirement does not apply to retaliation claims based on conduct that occurred before the EEOC charge was filed.

*Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 544-45 (6th Cir. 1991)); *see also, Calloway v. University of Louisville*, No. Civ.A. 3:04CV389-S, 2006 WL 1523229 *6-7 (W.D. Ky. May 25, 2006). A

court lacks subject matter jurisdiction over a retaliation claim where the plaintiff neither checked the box alleging retaliation on the discrimination charge or described events that demonstrate a retaliation claim. *Abeita*, 159 F.3d at 254. Plaintiff failed to allege retaliation in his discrimination charge; therefore, the court does not have any jurisdiction over any alleged acts of retaliation occurring prior to the date of Plaintiff's discrimination charge.

Plaintiff asserts that Kindred's failure to supply him with severance constituted unlawful retaliation related to his discrimination charge. However, Plaintiff provides no evidence of a defined policy regarding severance payments to employees who resign their positions. The only evidence pertaining to severance in the record appears in an exchange of emails reflecting a discussion among managers regarding severance when Mr. Ransdell was contemplating terminating Plaintiff's employment. [Court Doc. No. 35, Ex. 8]. This evidence indicates that Mr. Ransdell emailed Ms. Lusk in 2003 stating, "I called kathleen [sic] Carrol who had said there are no formal guidelines on the severance thing. It's still simply judgment call." *Id.* The evidence indicates that Kindred provided an employee comparable to Plaintiff, but who had a longer tenure with the company and whom it terminated, with six months severance in exchange for a severance agreement.

However, this evidence does not support Plaintiff's contention that Kindred had a policy of supplying employees who abruptly terminated their employment without notice with six months of severance. In addition, it appears that although Kindred may have supplied employees whom it terminated with some severance, it also appears from the scant evidence available on the issue that those employees lost their employment involuntarily, as well as signed a severance agreement. Plaintiff clearly is distinguishable from employees in those situations.

There is also no evidence in the record that Kindred provided the COOs at the Level I hospitals with a particular amount of severance when it terminated them. Plaintiff provides no evidence that Kindred's failure to offer him severance was related to his discrimination charge. Therefore, Plaintiff's claim that Kindred retaliated against him by not supplying him with severance will be **DISMISSED**.

### IV.    Conclusion

As stated *supra*, Plaintiff's claims of race and age discrimination pursuant to Title VII and the ADEA will be **DISMISSED**. Plaintiff's claim of unlawful retaliation will also be **DISMISSED**.

A separate order will enter.


            */s/ R. Allan Edgar*
            R. ALLAN EDGAR
            UNITED STATES DISTRICT JUDGE